IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 05-0272
════════════
 
Entergy Gulf States, Inc., 
Petitioner,
 
v.
 
John Summers, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Ninth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued October 16, 
2008
 
 
            
Justice 
Willett, concurring.
 
            
In times of political rancor, vengeful motives are swiftly attributed 
(and swiftly believed). This is unfortunate, but also unaffecting. The 
judiciary, rightly understood, is not a political institution but a legal one, 
meaning we must decide cases on the basis of principled legal points, not 
political talking points.
            
This appeal constitutes something of a legal Rorschach test: People see 
in it what they wish, and one person’s commendable restraint is another’s 
condemnable activism. Here, one side (Entergy) contends that judicial restraint 
requires a plain-language reading of the statute, that the surest manifestation 
of legislative will is found in legislative text. The other side (Summers) brands such a reading judicial activism, that 
gleaning intent demands a more holistic and embellished approach.
            
My view is uncomplicated: The law begins with language, and it smacks of 
Lewis Carroll when critics, voices raised high in derision, inveigh against 
“judicial activism” because judges refrain from rewriting the text lawmakers 
chose. This side of the looking glass, reading a statute as enacted is the nadir 
of activism, not its zenith. It must be stressed that even one of Summers’ amicus supporters concedes the statute can be read 
in Entergy’s favor[1] — a result that, sound and fury aside, 
“will probably not have a substantial impact on the workers’ compensation system 
as a whole.”[2]
            
I agree with the Court’s bottom-line result (and a good deal, though not 
all, of its analysis), but I write separately because this case raises important 
issues regarding statutory construction, and the judicial role more generally, 
that deserve fuller, more head-on treatment.
I. Introduction — Whether Entergy Can Qualify As a 
“General Contractor”
            
Today’s issue is simply stated but sharply disputed: Can a premises owner 
qualify as a “general contractor” under the Texas Workers’ Compensation Act? 
Amid the spirited debate, two preliminary matters are unchallenged: (1) premises 
owners who provide workers’ compensation insurance coverage to their own 
employees are statutorily immune from tort suits over work-related injuries; and 
(2) general contractors who cover their subcontractors’ employees are also 
immune. Today’s case presents a hybrid — whether a premises owner can serve as 
its own general contractor and assert the same exclusive-remedy defense as a 
contract employer that it asserts as a direct employer.
            
Consider: Two employees working side by side at a company-owned 
workplace, performing the same work when the same accident inflicts the same 
injuries. One worker is the company’s direct employee, the other its contract 
employee, both having voluntarily elected coverage under the same written, 
owner-provided workers’ compensation policy. If the owner meets the 
Legislature’s elastic definition of “general contractor” — written solely in 
terms of what contractors do, not what they own — then its 
contract employees are bound by the same agreed-to policy that binds its direct 
employees. Ownership nowhere proscribes what the Act prescribes.
            
Two things should drive our analysis — the Legislature’s language, which 
is open-ended, and this Court’s role, which is not. We must respect policy-laden 
statutes as written and give wide leeway to the innumerable trade-offs reflected 
therein. The Act’s definition of “general contractor” is sweeping (“a person who 
undertakes to procure the performance of work”) and carves out only one narrow 
exclusion (“a motor carrier that provides a 
transportation service through the use of an owner operator”). The 
wording is inclusive in general but exclusive in particular. The pre-1989 Act 
used a similarly broad definition (with no exclusion) but a companion definition 
suggested a premises owner could not serve as its own general contractor. 
Significantly, the Legislature deleted that explicit dual-hat reference in 1989 
as part of a substantive overhaul. Today’s Act does not deny the 
exclusive-remedy defense if the person who procures the work and provides the 
coverage — the two factors that define “statutory employer” — also owns the 
jobsite.
            
I agree with the Court. By “undertak[ing] to procure the performance of work,” Entergy meets the 
Legislature’s brief-but-broad definition. This, coupled with Entergy’s provision 
of workers’ comp coverage, confers statutory-employer status.
II. The Legislature’s 
Chosen Words Dictate the Outcome
            
The Act’s controlling provisions are straightforward:
 
·    “General contractor”: 
Any “person who undertakes to procure the performance of work or a service, 
either separately or through the use of subcontractors. The term includes a 
‘principal contractor,’ ‘original contractor,’ ‘prime contractor,’ or other 
analogous term.”[3]
 
·    “Subcontractor”: Any 
“person who contracts with a general contractor to perform all or part of the 
work or services that the general contractor has undertaken to perform.”[4]
 
·    Statutory employer: A 
general contractor “may enter into a written agreement [with a subcontractor] 
under which the general contractor provides workers’ compensation” coverage to 
the subcontractor and the subcontractor’s employees,[5] and such an agreement “makes the general 
contractor the employer of the subcontractor and the subcontractor’s employees . 
. . for purposes of the workers’ compensation laws.”[6]
 
·    Exclusive remedy: 
Workers’ compensation benefits are a covered employee’s “exclusive remedy” 
against an employer for work-related injuries.[7]
 
A. Legislative intent is revealed by legislative 
language
            
There is one building-block principle this Court has declared repeatedly 
and emphatically: the “surest guide” to what lawmakers intended is what 
lawmakers enacted.[8] We are interpreting words, and where 
those words are not doubtful, even though their wisdom may be, we are bound to 
honor them. Accordingly, since intent is driven by text, we must not accept the 
peculiar view that construing the Act’s definition of “general contractor” by 
its terms would subvert legislative intent.[9] Indeed, it is displacing the concreteness 
of what was actually said with the conjecture of what was allegedly meant that 
invites activism, a mischievous way for courts to put a finger on the scale (or 
in the wind) and thus substitute judicial intent for legislative intent. Our 
place in the constitutional architecture requires fidelity to what lawmakers 
actually passed.
            
Consequently, we must focus on what a statute says and, just as 
attentively, on what it does not say, taking care to honor substantive changes, 
both additions and deletions, made over the years, and always presuming that the 
Legislature chose its language carefully.[10] As for what the Act includes, its 
definition of “general contractor” is notable for two things: (1) a solitary 
description (“undertakes to procure the performance of work”), including a 
non-exhaustive list of synonyms (“‘principal contractor,’ ‘original contractor,’ 
‘prime contractor,’ or other analogous term”); and (2) a solitary exclusion (“a 
motor carrier that provides a transportation service through the use of an owner 
operator”). Any entity that falls inside the former and outside the latter is 
shielded from tort liability if it provides workers’ compensation coverage to 
its contractors’ employees. As for what the Act excludes, we must give 
effect to the Legislature’s deletion in 1989 of a provision (“contracted with 
another party”) that contemplated a general contractor contracting upstream with 
a premises owner.
B. The court of appeals disregarded the Act’s key 
provisions
1. it ignored the specific 
definition of “general contractor”
            
The court of appeals held “Entergy did not establish it had undertaken to 
perform work or services and then subcontracted part of that work to IMC, as a 
general contractor would have done.”[11] To reach this conclusion, the court 
relied on Williams v. Brown & Root, Inc., a 1997 court of appeals 
decision stating that “[a] general contractor is any person who contracts 
directly with the owner.”[12] The Williams court reasoned an 
entity that “did not contract with the owner, but instead was the owner” 
arguably fell outside the definition.[13] The Williams court, as the Court 
today notes,[14] committed a fundamental error, 
disregarding the Labor Code’s specific definition of “general contractor”[15] in favor of a more generic definition.[16] The Legislature often supplies its own 
dictionary, and where it provides a precise definition, courts must honor that 
substituted meaning.[17] Importantly, this admonition holds true 
even if the Legislature’s technical definition departs from the term’s ordinary 
meaning.[18] So while a general contractor may 
ordinarily be thought to contract with the premises owner — even though, 
as the Court observes, an owner serving as its own general contractor is “by no 
means uncommon”[19] — that construction must give way to the 
Act’s specific definitions.[20]
            
Contrary to the suggestion in Williams that an owner cannot double 
as a general contractor because it cannot contract with itself, the statute does 
not blanketly exclude premises owners who otherwise 
meet the Act’s undemanding criteria.[21] Nothing in the Act dictates that a 
premises owner who procures the work and provides the coverage, the only two 
factors that confer statutory-employer status, lack the same comp-bar immunity 
granted someone who performs the very same actions but lacks title to the 
worksite.[22]
            
The legal test for determining whether Entergy can invoke the 
exclusive-remedy defense is not whether the statute explicitly includes 
“owners.” The test is a simple one: Does Entergy meet 
Chapter 406's eligibility criteria? The record shows clearly that Entergy 
“[undertook] to procure the performance of work” from IMC.[23] Deposition testimony established that 
Entergy hired IMC to “supplement the Entergy employee workforce” and help 
perform maintenance, including “water and turbine-related, generator-related 
work,” at its Sabine plant. Summers’ own summary-judgment response concedes that 
Entergy “entered into a contract with [IMC] for IMC to perform various 
maintenance work at Entergy’s plant in Bridge City, Texas.” Entergy undeniably “under[took] to procure the performance of work,” thus meeting 
the Act’s broad definition, and because it also provided the workers’ 
compensation policy under which Summers recovered, Entergy is his statutory 
employer.
2. it utilized a 
long-discarded definition of “subcontractor”
            
The court of appeals in this case (and the Williams court) also 
erred in relying on Wilkerson v. Monsanto Co., a federal district court 
decision holding that a premises owner cannot be a statutory employer (because 
it cannot be a general contractor).[24] Here, too, the mistake concerns a 
misused statutory definition. Wilkerson, unlike today’s case, was 
governed by the pre-1989 definition of “subcontractor”: “a person who has 
contracted to perform all or any part of the work or services which a prime 
contractor has contracted with another party to perform.”[25] The Wilkerson court interpreted 
“contracted with another party” to mean the prime contractor and premises owner 
must be distinct entities.[26] The court said this phrase, the law from 
1983 until 1989,[27] meant a general contractor was 
necessarily an intermediary that contracts both upstream with the premises owner 
and downstream with the subcontractor. As the owner’s contracts in Wilkerson 
were all downstream, he could not be a statutory employer.[28]
            
Assuming Wilkerson was correctly decided, it lacks any 
interpretive force today, for a simple reason: Wilkerson turned entirely 
on four words the Legislature removed during its 1989 substantive rewrite.[29] Here are the pre- and post-overhaul 
definitions that, construed together, control our decision:
 

 
 
 
  
 
 prime/general contractor
 
 subcontractor
 
 
 pre-1989
  
 
 “the person who has undertaken to procure the 
 performance of work or services” and “‘prime contractor’ includes 
 ‘principal contractor,’ ‘original contractor,’ or ‘general contractor’ as 
 those terms are commonly used”[30]
 
 “a person who has contracted to perform all or any 
 part of the work or services which a prime contractor has contracted with 
 another party to perform”[31]
 
 
 current
 
 “a person who undertakes 
 to procure the performance of work or a service . . . . The term includes 
 a ‘principal contractor,’ ‘original contractor,’ ‘prime contractor,’ or 
 other analogous term. The term does not include a motor carrier that 
 provides a transportation service through the use of an owner operator”[32]
 
 “a person who contracts with a general contractor 
 to perform all or part of the work or services that the general contractor 
 has undertaken to perform”[33]
  
  
  
  
 
 key
 change
 
 current definition excludes a single class of 
 otherwise eligible persons: certain motor carriers, nobody 
 else
 
 current definition no longer imposes an “upstream 
 contract” condition on general contractors
 
            
As seen above, the 1989 reform bill deleted “contracted with another 
party,” the critical upstream-contract phrase that anchored Wilkerson and 
suggested a premises owner could not wear the hat of general contractor. The 
before-and-after comparison is difficult to brush aside. While the 1983-1989 Act 
indicated that a contractor undertook action on behalf of someone else (the 
owner), the Legislature in 1989 removed that upstream inference. Our cases 
require us to treat such omissions as meaningful and not meaningless,[34] a principle even more prudent when 
deletions occur, as here, within a substantive overhaul that constitutes the 
lone piece of legislation that lawmakers are 
considering.[35] Wilkerson remains instructive 
only to underscore that statutory construction must honor statutory 
definitions.
            
Summers urges a construction rooted in now-repealed language. While 
conceding that “contracted with another party” appears nowhere in the current 
statute, Summers insists the upstream-contract notion 
was not deleted but transplanted, subsumed now by the phrase “undertakes to 
procure” in the definition of “general contractor.” This contention — that the 
upstream-contract condition was moved but not removed — is facially 
counterfactual, betrayed by this inconvenient truth: “undertake[ ] to procure” also appeared in the pre-1989 
definition. Even though this phrase predated the 1989 overhaul, Summers argues it became implicitly freighted with what was 
once explicitly stated (in a different definition). This argument is 
unpersuasive. Updated criteria require updated analysis. It is untenable that 
the four words so important in Wilkerson were, though deleted, imported 
into three words that predated Wilkerson. Summers’ argument would 
reinsert what lawmakers took out and declare this part of a massive 
modernization bill — the part that anchors the precedent upon which Summers relies most — wholly nonsubstantive and merely aesthetic.[36]
            
We cannot treat the upstream-contract language in the 1983-1989 Act as 
mere surplusage and its 1989 deletion a nullity. Nor 
does the dissent pivot on Summers’ argument that 
“undertakes to procure” necessarily implies an upstream obligation and must be 
read as “undertakes to procure for someone else.” The deletion of 
something explicit means more than the retention of something implicit. Indeed, 
several Texas 
statutes use “undertake” to describe a person acting to benefit himself.[37] More to the point, when lawmakers have 
in mind an entity doing something on another’s behalf, they have no difficulty 
saying so explicitly, often using “undertakes” in tandem with clear third-party 
language like “for another person.”[38] In such instances, including elsewhere 
in the Labor Code, the Legislature has done more than imply a third-party 
obligation; it has stated one outright, something lawmakers in 1989 did not do, 
instead choosing to scrap preexisting third-party language.[39]
            
The Act as written bars Summers’ claim, and it merits mention that even 
certain counsel supporting Summers concede the statutory text can be read in 
Entergy’s favor: “Based on statutory language alone, reasonable persons may 
differ on whether a premises owner may also act as a general contractor in the 
procurement of work and provision of workers’ compensation coverage, thus 
receiving the exclusive remedy protection from third party actions.”[40] Thus, we are directed to arguments that 
look beyond the statute itself.
III. Settled Precedent Bars Summers’ Extratextual Arguments
            
Summers and his aligned amici contend that 
several factors outside the Act’s actual language support a more flexible 
statutory reading. The Court correctly rejects these arguments, and notably the 
dissent implicitly does likewise.
A. Failed bills 
predating and postdating the Act’s 1989
overhaul carry no interpretive force
 
            
Summers and various amici exhort us to construe 
language that passed in light of language that failed to pass. As the Court 
makes clear, we cannot. Precedent from both the United States Supreme Court and 
from this Court counsel against supplanting unequivocal enacted text with 
equivocal unenacted inferences drawn from failed 
legislation.
            
First, counsel supporting Summers direct us to 
the 1989 overhaul effort itself. It is undisputed that the 71st Legislature was 
consumed with the task of restructuring the State’s then-76-year-old workers’ 
compensation system.[41] The regular 140-day session failed to 
produce a reform bill, and Governor Clements immediately called a special 
session. Summers places great weight on the fact that during this first of two 
special sessions, House members once considered an omnibus bill that used “owner 
or general contractor” in section 406.123’s predecessor. House-Senate 
negotiations collapsed, reportedly over two unrelated issues,[42] and lawmakers adjourned and went home 
for several months. Later that year, Governor Clements called a second special 
session, and in its final hours the Legislature passed Senate Bill 1, which did 
not expressly include the word “owner,” a fact Summers 
views as dispositive.
            
This argument is unavailing, as the United States Supreme Court recently 
explained: “It is always perilous to derive the meaning of an adopted provision 
from another provision deleted in the drafting process.”[43] The word’s momentary presence during 
Special Session No. 1 and absence several months later during Special Session 
No. 2 suggests nothing that can override the express terms of the enacted 
statute.[44] Under Summers’ position, we must assign 
great meaning to never-enacted language (“owner”) that appeared in a prior 
session’s bill draft but no meaning to once-enacted language (“contracted with 
another party”) that the Legislature affirmatively removed from an on-the-books 
statute. We cannot bestow all significance on proposed alterations in failed 
bills while ignoring enacted alterations to the statute itself. Settled law 
requires the opposite approach, respecting changes to actual statutes and 
discounting changes to would-be statutes.
            
Second, counsel supporting Summers ask us to 
examine post-1989 legislative efforts and conclude that intent to bar premises 
owners from invoking statutory-employer immunity is implicit in the 
Legislature’s consideration, but not adoption, of various bills since 1989 
related to premises-owner liability.[45] Summers sees the failure of these 
measures as tantamount to a legislative command to exclude premises owners from 
asserting the exclusive-remedy defense.
            
We cannot draw such an inference for two reasons. First, the Act itself 
controls, and its definitions include no such exclusion. Far more probative than 
proposed legislation is passed legislation, what the people’s elected 
representatives actually enacted as a collective body. The Legislature’s “broad 
definition, narrow exception” approach to “general contractor” and deletion of 
the upstream-contract language constitute dual reasons for not barring dual 
roles for those meeting the Act’s liberal definitional criteria.
            
Second, we eschew guesswork, and a bill’s failure to pass sheds no light 
because, as even casual Capitol observers know, bills fall short for countless 
reasons, many of them “wholly unrelated” to the bill’s substantive merits or “to 
the Legislature’s view of what the original statute does or does not mean.”[46] Bills rise and fall for reasons both 
incalculable and inscrutable, and courts’ reluctance to draw inferences from 
subsequent legislative inaction is deeply rooted, as explained by the 
United 
States Supreme Court a half-century ago: “Such 
non-action by Congress affords the most dubious foundation for drawing positive 
inferences. . . . Whether Congress thought the proposal unwise . . . or 
unnecessary, we cannot tell; accordingly, no inference can properly be drawn 
from the failure of the Congress to act.”[47] We, too, reject searching for 
confirmation or contradiction in later sessions’ unsuccessful bill drafts.[48] As non-adoption infers nothing 
authoritative about an earlier statute’s meaning, we do not consult failed bills 
to divine what a previous Legislature intended.
            
Even if our precedent allowed us to conflate inaction with intention, the 
bills, as the Court notes, were not only unsuccessful but immaterial. The bill 
that comes closest, Senate Bill 1404 from the 76th Legislature in 1999, would 
have amended “general contractor” to include “an owner or lessor of real property.”[49] Any relevance ends there. Senate Bill 
1404 would have let general contractors (whether owners or not) invoke the 
exclusive-remedy defense either by providing coverage directly or “by entering 
into a written agreement with another person under which the other person 
provides the coverage.”[50] Today’s question differs significantly: 
whether a premises owner who meets every current statutory-employer criteria is 
nonetheless excluded. So while some bills over time would have extended comp-bar 
immunity to owners (1) who merely require coverage (Senate Bill 1404),[51] (2) who directly provide coverage but do 
not also act as their own general contractors (House Bills 2279 and 3024),[52] (3) who are a parent or subsidiary 
corporation of an entity that provides coverage (House Bill 3120, House Bill 
3459, and Senate Bill 675),[53] or (4) who are engaged in construction 
or building with a general contractor and a subcontractor where one of them 
provides coverage (House Bills 2982 and 1626),[54] those expansions of immunity are 
committed to the Legislature’s broad policymaking discretion. They are not 
today’s case, which examines whether Entergy is disqualified under existing law 
despite meeting every applicable criteria.
            
As for Senate Bill 1404, the legislative record is completely bare as to 
the individual sponsor’s (or anyone else’s) objective. The bill was referred to 
committee and then left pending; no hearing, no testimony, no bill analysis, no 
action whatsoever. Even if the bill were on all fours, a single bill — filed the 
day before the filing deadline[55] and never heard from again — hardly 
constitutes the Legislature “repeatedly reject[ing]” 
the notion of a premises owner acting dually as a general contractor under the 
Workers’ Compensation Act. In fact, even if there were a failed bill that added 
“owner” to the existing definition and nothing else, it would be immaterial. 
Lawmakers may have thought such a bill unwise, or maybe unnecessary. Who knows? 
Either way, it is imprudent for courts to draw forensic truths from legislative 
machinations, ascribing intent and motivations based on nothing more than a 
judge’s hunch as to what 181 autonomous lawmakers collectively had in mind. As 
Judge Easterbrook observes, “Intent is elusive for a natural person, fictive for 
a collective body.”[56]
B. Neither 
purposive analysis nor off-the-mark representations regarding legislative 
history can trump the Legislature’s enacted text
 
            
On a related front, amici supporting Summers exhort us to throw off our interpretive “shackles” 
and embrace a “thorough” and “expansive methodology” that relies on various 
interpretive tools that look beyond the Legislature’s chosen language. Given the 
lack of textual ambiguity, I reject this eclectic approach.[57] The text that lawmakers passed is the 
truest index of legislative will, and the Legislature defines “general 
contractor” in terms of what a contractor does, not in terms of what a 
contractor owns. The definition uses the word “owner” exactly one time, 
to make clear that motor carriers that use owner operators to provide 
transportation services are excluded. There is indeed an owner-related exclusion 
in the Act, but it is specific, not general.
            
Notably, the dissent, while siding with Summers, 
also declines this nontextual approach. True, we 
periodically consult external materials when text is nebulous and susceptible to 
varying interpretations, but even then, we proceed “cautiously,”[58] mindful that such materials conflict as 
often as they converge and that our goal is “to solve, but not to create, an 
ambiguity.”[59] Even in rare cases where we mine 
secondary sources to help clarify ambiguity, judges, while not limited to 
the text, should always be limited by the text.[60]
            
Indeed, this case demonstrates vividly the perils of uncritical reliance 
on legislative history. It is distressing that those citing the legislative 
record in this case sometimes do so:
$          
inaccurately:      
misstating when key legislative changes to the draft Act occurred;[61]
 
$          
selectively:        playing up 
friendly snippets that they believe reinforce a wished-for interpretation and 
ignoring snippets that subvert it;[62]
 
$          
misleadingly:     
mischaracterizing the import of legislative actions;[63]
 
And then, when 
confronted with a tidbit from the record that can be spun Entergy’s way, Summers dismisses it as something uttered mistakenly.[64]
            
Laws exist to guide behavior, and by resting on statutory language rather 
than embarking on a scavenger hunt for extratextual 
clues prone to contrivance,[65] we ensure that everyday Texans 
struggling to decode the law and manage their affairs consistent with it can 
rely on a statute “to mean what it says,”[66] without having to hire lawyers to scour 
the legislative record for unexpressed (and often contradictory) indicia of 
intent. As we recently held, if text is not hazy, we must resist morphing 
statutory construction into statutory excavation and instead “take the 
Legislature at its word and not rummage around in legislative minutiae.”[67]
C. The Act is not 
“absurd” if injured deemed employees receive the same
relief as injured direct employees
 
            
Summers insists we must adopt a relaxed interpretation more consonant 
with fairness because reading “general contractor” to limit contract workers to 
the same recovery that direct workers receive would render the term “meaningless 
and absurd.”[68] While a looser reading is warranted when 
a straight-up reading produces a patently nonsensical result (not merely an 
unpleasant one), this is not such a case.
            
Under Summers’ reading, a separate contractor 
would escape tort liability, but a premises owner who performs every 
contracting-related chore the separate contractor would perform would not. More 
to the point, a general contractor that oversees work on its own property 
could not qualify as a general contractor under the Act. That was perhaps true 
in the 1983-1989 Act, as Wilkerson held, but the Legislature’s 
top-to-bottom rewrite amended the law.
            
One can complain that current comp benefits are inadequate, but it is 
unpersuasive to equate equality — direct and contract employees receiving the 
same benefits when the employer owns the jobsite — with absurdity.[69] There is nothing nonsensical (or even 
uncommon[70]) about a premises owner serving as its 
own general contractor or a reading of the Act that results in expanded jobsite 
coverage by urging premises owners to secure coverage for their subcontractors’ 
workers.[71] The comp system quid pro quo — 
exchanging uncertain tort recovery for no-fault medical and income benefits — 
has been the embedded public policy of Texas since Woodrow Wilson became 
President, and wider coverage — that is, more injured workers receiving 
such compensation — only advances that policy.
D. Judges have no 
authority to second-guess the myriad policy judgments codified
in the Workers’ Compensation Act
 
            
The 1989 restructuring of the Texas 
workers’ compensation scheme — labeled “the most divisive legislative endeavor 
in contemporary Texas politics”[72] — consumed the 71st Legislature for one 
regular and “two special sessions fraught with obstinacy and emotion.”[73] What emerged embodied innumerable and 
quintessential legislative judgments. The recovery of workers’ comp benefits is 
dictated by the Legislature’s definitions, not by this Court’s declarations. We 
must refrain from rewriting the text lawmakers chose, here by reinserting 
third-party language the Legislature deleted.[74]
            
Laid bare, Summers’ core complaint is that 
benefits under the Act are too stingy. We are ill-equipped to assess this 
charge. The Act, whatever its alleged shortcomings, embodies century-old public 
policy, and courts must read the Legislature’s words as enacted, not revise them 
as desired. “The wisdom or expediency of the law is the Legislature’s 
prerogative, not ours”[75] — a fundamental point we recently 
reaffirmed: “arguments that the statute is unwise or unfair must be addressed to 
the Texas Legislature.”[76]
            
It may be correct that lawmakers in 1989 did not intend to permit a 
dual-hat role for premises owners. Workers’ comp reform was a Herculean, 
multiple-session undertaking, one made tougher with short deadlines for drafting 
and short fuses for drafters. Heaven knows laws sometimes pass quickly amid 
urgent circumstances with scant discussion, yielding untoward ramifications over 
time. Recent examples of voting-without-reading abound, including the newly 
passed $789,000,000,000 (and 1,073-page) American Recovery and Reinvestment Act 
of 2009, which provided “a rare window into the mad cookery of complex 
legislation” — the final draft “filled with hand-written copy-editing marks, 
insertions scrawled in the margins, deletions of whole paragraphs boxed with X’s 
slashing through them, and a variety of curious hash marks and other 
annotations.”[77] Even Evelyn Wood would struggle mightily 
to read the bill, much less cast an informed vote.
            
Even when laws are meticulously drafted and thoughtfully debated, 
legislative handiwork must often bend to a still more powerful force: the law of 
unintended consequences.[78] To be sure, people are inventive at 
finding ways to confound lawmakers’ wishes rather than conform to them. But even 
if we suspected lawmakers intended to retain a third-party requirement despite 
deleting third-party language, we could not judicially reinsert the requirement, 
however desirable as a policy matter.
            
Legislative text is often elastic, like the “general contractor” 
definition in this case, but the judicial role is not. When divining what 
lawmakers intended to do, we must focus on what they in fact did do and presume 
they meant what their words mean. Where language is not unclear, a judge’s 
doctrinal toolbox is limited. I do not share the view that reliance on text is 
pretext, that reading laws as written is mere figleafing to disguise judicial willfulness aimed at 
imposing ideologically congenial results. Purposive decisionmaking is achieved more readily (and easily) by 
straying from text than by sticking to it, and hewing to the Legislature’s 
as-written language has repeatedly led me to results I strongly dislike.
            
Obviously, if lawmakers in 2009 (or later) dislike the Court’s 
interpretation of the words their 1989 predecessors chose — or believe their 
predecessors drafted with imprecision — the remedy, and it is a simple one, 
rests wholly with them. This is precisely how the separation of powers works 
among co-equal branches of government. The presumption that lawmakers intended 
what they enacted is not just required and well-settled but desired and 
well-founded. It is an accommodation rooted in carefulness, not certitude. The 
Legislature can easily reinsert an upstream-contract provision if it believes 
our interpretation is wooden legalism that honors the letter of the law but not 
its spirit, thus letting premises owners slip through an unintended 
loophole.
IV. A Brief Take on the Dissent
            
The Court briefly addresses the dissent’s arguments, but more can be 
said. The dissent’s chief contention is that lawmakers “expressly tethered” 
general contractor to other terms that are “commonly understood to mean a person 
who has contracted with an owner”[79] — like “‘principal contractor,’ 
‘original contractor,’ and ‘prime contractor’ . . . all terms that envision a 
tripartite relationship” among an owner, a general contractor, and 
subcontractors.[80] The dissent acknowledges the listed 
terms “are not exhaustive” but concludes, rather conclusorily, that the notion of an owner-contractor “is 
simply not analogous.”[81]
            
Like the Court, I find the dissent’s argument unpersuasive, for several 
reasons. First, the dissent cites the “common usage” provision of the Code 
Construction Act[82] in urging a “commonly understood” 
reading of general contractor. However, the Act’s very next provision stresses 
that “common usage” must yield to specific legislative definitions.[83] Thus, “ordinary meanings should be 
applied only to undefined terms.”[84] The Legislature enacted a specialized 
definition of general contractor, and in 1989 deleted not only the 
upstream-contract condition, but also the injunction to interpret the synonyms 
for general contractor “as those terms are commonly used.”[85] If a statute defines a term, “a court is 
bound to construe that term by its statutory definition only,”[86] deference that seems especially 
warranted where, as here, the statute omits an earlier directive to apply common 
usage. In any case, given the ordinariness of premises owners acting as their 
own general contractors,[87] I fail to understand the dissent’s 
outright rejection of “owner contractor” as dissimilar.
            
Second, the dissent looks for support in statutory definitions of 
“contractor” outside the Workers’ Compensation Act that explicitly mention a 
third-party requirement.[88] However, none of these cited provisions 
define general contractor. There exists in Texas statutory law only 
one definition of this term, Labor Code section 406.121, the provision at issue 
today. The Act nowhere defines “contractor,” though “independent contractor,” 
the term most analogous to the non-Act “contractor” provisions cited by the 
dissent, is defined (immediately below the definition of “general 
contractor”) as someone “who contracts to perform work or provide a service 
for the benefit of another.”[89] The definition by its terms requires an 
upstream relationship, something the “general contractor” definition does not. 
If anything, the provisions cited by the dissent, and the “independent 
contractor” definition in the Act itself, only strengthen the Court’s position, 
showing that the Legislature is adept at including explicit third-party language 
when it chooses. The fact that the Legislature did not add third-party language 
here — even more, it subtracted such language — only fortifies the 
Court’s interpretation.
            
Third, the dissent relies on two of our prior cases to assert we have 
“recognized for almost a century that a contractor” has a third-party 
requirement.[90] A careful examination of these cases, 
however, shows that both cases concern whether an injured worker is an employee 
or an independent contractor and not whether a premises owner can qualify as a 
general contractor.[91] Together, the two cases use the phrase 
“independent contractor” nineteen times and the phrase “general contractor” none 
at all. The cases are simply inapposite, though again, by focusing on 
“independent contractor,” they draw attention to the Act’s current definition of 
that term, one that on its face requires a third-party relationship, unlike the 
“general contractor” definition that immediately precedes it.
            
Finally, the absence of “owner contractor” from a list the dissent 
concedes is nonexhaustive[92] (something we must construe liberally) 
is less notable than the absence of “premises owner” from the Act’s exclusion 
(something we must construe strictly). The analogous terms seem of a kind and 
interchangeable, which makes the motor-carriers exclusion seem markedly out of 
place, suggesting that the definition was otherwise broad enough to capture 
them. Stated differently, there seemed an awareness that entities beyond the 
listed terms could fall within the broad definition, but only this narrow class 
was carved out.
V. A Brief Take on Justice Hecht’s Concurrence
            
If my understanding is correct, the dissenters reject their original view 
of the case and now insist a premises owner has never been entitled to 
statutory-employer status by providing comp coverage to subcontractors and their 
employees. Conversely, the Court and Justice Hecht apparently believe that 
access to the exclusive-remedy defense by providing such coverage has been 
available perhaps since 1917, when a provision was added that is now section 
406.124 of the Labor Code, and is certainly available today. My position, 
detailed above, is that the defense was made available in 1989, when lawmakers 
removed third-party language from the Act.
            
The Court’s and Justice 
Hecht’s attention to section 406.124 and its earlier enacted versions is 
unhelpful (and unnecessary in my view given the deletion in 1989 of the 
upstream-contract language). Section 406.124 currently provides that if a 
“person” hires a “subcontractor,” not for any legitimate reason but instead 
“with the intent to avoid liability” under the workers’ compensation laws, the 
scheme will fail because the worker will be deemed the person’s employee. This 
provision earlier applied to “subscribers” rather than “persons,” but in any 
case it has always applied to all statutory employers subject to the workers’ 
compensation laws.
            
Section 406.124 is a rarely employed subterfuge provision intended to 
thwart sham attempts by an employer to mischaracterize an employee as a 
subcontractor and thereby avoid comp liability. It says as much — applying to 
all statutory employers and targeting efforts to evade liability. The 
general-contractor provision at issue in today’s case, currently section 
406.123, addresses the separate matter of extending statutory-employer status to 
a general contractor who retains a legitimate, independent subcontractor and 
wishes to cover the subcontractor’s employees. The general-contractor provision 
was added in 1983, and substantively rewritten in 1989, as I discuss above.
            
I essentially agree with Justice 
O’Neill on this point. None of the parties rely on section 406.124, and 
it is irrelevant to the key inquiry: whether a premises owner can be a general 
contractor under section 406.123. The latter provision has never applied to all 
subscribers, but is limited to general contractors. Today’s issue is whether a 
premises owner can fall within the definition of “general contractor,” a subset 
of all subscribers.
            
So while I agree with the Court’s result and most of its reasoning, I 
part company with the Court and Justice 
Hecht on the relevance of the subterfuge provision and its history, even 
though the changes to this provision and the eventual enactment of the 
general-contractor provision share a common legislative ancestry to some extent. 
In short, I see less ambiguity than Justice Hecht does in the 
general-contractor and subcontractor definitions. (Interestingly, he attaches no significance to the Legislature’s 
1989 deletion of “contracted with another party.”) If anything, his 
meticulous effort to lay out the history of sections 406.123 and 406.124 and 
their interplay convinces me, more than ever, that we should focus on the text 
as enacted (and amended) and resist entreaties to meditate on the varying 
motives and atmospherics that may have spurred the thousand-plus Texas 
legislators who have dealt with workers’ compensation over the past ninety-six 
years. I simply do not share Justice 
Hecht’s “ambiguity” diagnosis,[93] though I certainly share his aversion to 
divorcing text, plain or not, from context.[94]
            
For the reasons discussed in Parts I-IV above, I disagree that the Act 
can be read either way and thus requires a gestalt 
examination of a near-century of legislative machinations for whatever 
authoritative lessons can be gleaned from that odyssey, interesting though it 
may be.[95] Again, I would hold that the 
general-contractor provision, unlike its pre-1989 version, does not forbid a 
premises owner from acting as its own general contractor.
VI. Conclusion
            
Courts are charged with exercising judgment, not will,[96] and judicial judgment — awareness of the 
line between adjudication and legislation and refusing to cross it — means 
giving wide berth to legislative judgment. On policy matters, we must aim for 
utter disinterestedness, meaning we must interpret the Act as it is written, not 
as we might have written it. The Texas Workers’ Compensation Act is replete with 
countless policy trade-offs, and our confined role, one defined chiefly by 
limits and duties, not by powers, is to construe statutes as we find them, not 
to second-guess or refine them.
            
The Court has reached the correct result, and for the reasons discussed 
above, I join all but Parts IV, V, and VIII of its decision.
 
                                                
___________________________________
                                                                        
Don R. Willett
Justice
 
OPINION DELIVERED: April 3, 2009







[1] 
Written Testimony of the Texas Association of Defense Counsel: Hearing on 
Interim Charge Number Eight Before the Senate State Affairs Comm., 80th Leg., 
Interim (April 28, 2008).

[2] 
According to legislative testimony from this pro-Summers amicus:
 
Whatever decision the court ultimately makes in the 
Entergy case will probably not have a substantial impact on the workers’ 
compensation system as a whole. . . . [O]nly 
relatively large owners or contractors can afford to administer the kinds of 
insurance programs involved in the case, so we do not expect a sudden shift in 
this direction.
 
Id.

[3] 
Tex. Lab. Code § 406.121(1).

[4] 
Id. § 
406.121(5).

[5] 
Id. 
§ 406.123(a).

[6] 
Id. 
§ 406.123(e).

[7] 
Id. 
§ 408.001(a).

[8] 
Leland v. Brandal, 257 S.W.3d 204, 206 
(Tex. 2008) (quoting Fitzgerald v. Advanced 
Spine Fixation Sys., 996 S.W.2d 864, 866 (Tex. 1999)).

[9] 
Many observers, including lawyers, often conflate legislative intent with 
legislative history. They are distinct. Under our cases, determining intent is 
the objective, and where text is clear, text is determinative. Legislative 
history is a device some judges use to discern intent when text is 
unclear.

[10] See Cameron v. Terrell & Garrett, 
Inc., 618 S.W.2d 535, 540 (Tex. 1981); 
Eddins-Walcher Butane Co. v. Calvert, 298 S.W.2d 
93, 96 (Tex. 
1957).

[11] __ S.W.3d __.

[12] Id. (quoting Williams v. Brown & 
Root, Inc., 947 S.W.2d 673, 677 (Tex. App.—Texarkana 1997, no writ)) 
(internal quotation marks omitted) (alteration in original).

[13] Williams, 947 
S.W.2d at 677.

[14] __ S.W.3d __.

[15] The Williams court quoted the 
then-applicable statutory definition of “general contractor,” 947 S.W.2d at 676, 
which is virtually identical to the current definition.

[16] Id. at 677 (“A general contractor is 
any person who contracts directly with the owner, the phrase not being limited 
to one undertaking to complete every part of the work.”) (quoting 17 C.J.S. Contracts § 11 (1963)) (internal quotations omitted).

[17] Tex. Gov’t Code § 311.011(b).

[18] See Tijerina 
v. City of Tyler, 846 
S.W.2d 825, 827 (Tex. 1992).

[19] __ S.W.3d __.

[20] The 1983-1989 definition of “prime 
contractor” made clear it was using the term, and similar terms, “as those terms 
are commonly used.” See Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(c), 1983 Tex. Gen. Laws 5210, 5210 
amended by Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05(a)(2), 1989 Tex. Gen. Laws 1, 15. This 
“commonly used” admonition was deleted during the 1989 rewrite, and the current 
Act uses “or other analogous term.” Tex. 
Lab. Code § 406.121(1).

[21] See Tex. Lab. Code § 
406.121(1).

[22] The Court is not alone in holding that a 
premises owner can act as its own general contractor for purposes of a workers’ 
compensation statute. The Supreme Court of Tennessee in Brown v. Canterbury 
Corp., 844 S.W.2d 134 (Tenn. 1992), 
considered whether an owner may nonetheless qualify as a principal contractor 
under the Tennessee workers’ compensation statute (which 
like ours does not mention “owner”). See Tenn. Code Ann. § 50-6-113. The court 
acknowledged that earlier cases “created a distinction between an owner of 
property and a general contractor, holding that an entity could be considered a 
principal contractor within the meaning of the workers’ compensation act only if 
it performed work ‘for another.’” Brown, 844 S.W.2d at 
137. The court rejected these older cases, noting that “more recent 
decisions” allowed an owner to act as its own principal contractor. Id. 
Tennessee revisited the issue more recently in Rucker v. Rockwood Electric 
Utilities. No. 03S01-9511-CH-00127, 1996 WL 626292, at *3 
(Tenn. Oct. 30, 1996) (not designated for publication). Pursuant to 
Tennessee Supreme Court Rule 4(A)(3), an opinion of the 
Special Workers’ Compensation Appeals Panel is not published unless a majority 
of the Tennessee Supreme Court votes for it to be published. In that case, the 
Special Workers’ Compensation Appeals Panel of the Supreme Court found that 
Rockwood Electric Utilities, an owner, was acting as a statutory employer. 
Id. 
The Panel relied on an earlier Tennessee Supreme Court opinion that 
specifically rejected a third-party requirement. Id. (citing Stratton v. United Inter-Mountain 
Tel. Co., 695 S.W.2d 947 (Tenn. 1985)). Similarly, the Supreme Court of 
Florida recognizes that a premises owner is entitled to comp-bar immunity “where 
an owner assumes the role of contractor and employer and, consequently, the duty 
to provide workers’ compensation benefits.” Ramos v. Univision Holdings, Inc., 655 So.2d 89, 90 (Fla. 
1995).

[23] “Procure” means “to obtain by care or 
effort, to acquire.” Oxford American Dictionary 
533 (1980).

[24] 782 F. Supp. 1187, 1188 (E.D. Tex. 
1991).

[25] Id. at 1189 (emphasis added) (relying 
on Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, 
sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 (previously codified at Tex. Rev. Civ. Stat. art. 8308-3.05)).

[26] Id. at 1188–89.

[27] Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 
amended by Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, sec. 3.05(a)(5), 1989 Tex. Gen. Laws 1, 15, 
codified as Tex. Lab. Code § 406.121(5).

[28] Another distinction between 
Wilkerson and this case: In Wilkerson, the contract between the 
owner and the plaintiff’s direct employer affirmatively disclaimed any 
employment relationship between the owner and the contractor’s employees, 782 F. 
Supp. at 1188, while in this case, the contract language explicitly identifies 
Entergy as the “principal employer” and reserves to Entergy the right to assert 
statutory-employer status against contract employees’ personal-injury 
suits.

[29] See Act of May 28, 1983, 68th Leg. 
R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 
5210, 5210 (amended 1989).

[30] See Act of May 28, 1983, 68th Leg. 
R.S., ch. 950, § 1, sec. 6(c), 1983 Tex. Gen. Laws 
5210, 5210, amended by Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, sec. 3.05(a)(2), 1989 Tex. Gen. Laws 1, 15.

[31] See Act of May 28, 1983, 68th Leg., 
R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 
5210, 5210 (amended 1989).

[32] Tex. Lab. Code § 
406.121(1).

[33] Id. § 406.121(5). Today’s definition of 
“subcontractor” was tweaked slightly (and nonsubstantively) as part of the 1993 codification of the 
Labor Code. Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 1, sec. 406.121(5), 1993 Tex. Gen. Laws 987, 
1158. It is derived almost verbatim from the 1989 overhaul’s definition. 
Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 
3.05(a)(5), 1989 Tex. Gen. Laws 1, 15.

[34] See In re Ament, 890 S.W.2d 39, 41 (Tex. 1994) (per curiam); 
Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981). In a sense, 
Entergy hired IMC to help Entergy fulfill an upstream obligation, a statutory 
one at that: to “furnish service, instrumentalities, and facilities that are 
safe, adequate, efficient, and reasonable.” See Tex. Util. Code § 38.001.

[35] We presume that lawmakers enact statutes 
“with complete knowledge of the existing law and with reference to it,” Acker 
v. Tex. Water Comm’n, 790 S.W.2d 299, 301 
(Tex. 1990), 
and that any omissions are intentional, Cameron, 618 S.W.2d at 
540.

[36] One amicus, citing the Sherlock Holmes 
story of the dog that did not bark, Sir Arthur Conan Doyle, Silver Blaze, 
The Memoirs of Sherlock Holmes 
(1894), argues it is more likely the Legislature intended to change a 
statute by adding words than by deleting them: “That is because 
the deletion of words is more likely to have been done by mistake and deletions 
are more difficult for legislators to recognize during the legislative process 
than added words.” Unlike Holmes, we are not studying the import of conspicuous 
silence, but the import of conspicuous deletion. The Legislature in 1989 
affirmatively removed words indicating an upstream contract. It may well be 
true, as the amicus asserts, that “omitted language is less likely to come to 
the consciousness of legislators in the often chaotic process of legislating,” 
but chaotic or not, Texas law requires us to accept that lawmakers 
acted intentionally, not inadvertently. However clamorous the Capitol was in 
1989, our cases forbid any presumption that the Legislature was 
inattentive.

[37] See, e.g., Tex. Agric. Code § 12.040(d)(3)(C) (“a long-term plan outlining the steps the community 
will undertake to maintain its desirability . . . .”); Tex. Ins. Code § 751.002(b) (“. . . the 
department or commissioner . . . may undertake market analysis or market conduct 
action . . . .”); Tex. Loc. Gov’t 
Code § 232.093(e) (“Before a planning commission member undertakes the 
duties of the office . . . .”); Tex. 
Transp. Code § 454.001(b)(1) (“A municipality . 
. . may undertake research, development, and demonstration projects . . . .”); 
Tex. Util. Code § 52.256(b)(3) (“. . . the telecommunications utility will undertake to 
achieve each of these initiatives . . . .”).

[38] See, e.g., Tex. Occ. Code § 1702.108 (“A person 
acts as a guard company . . . if the person . . . undertakes to provide . . . 
for another person . . . .”); Tex. Local Gov’t Code § 176.001(1) 
(“‘Agent’ means a third party who undertakes . . . for another person . . . .”); 
Tex. Gov’t Code § 27.006(a)(1) (“A justice commits an offense if the justice: . . . 
undertakes . . . for another . . . .”); 
Tex. Lab. Code § 21.002(9)(A) (“‘Employment Agency’ means a person . . . who regularly 
undertakes . . . to procure: (A) employees for an employer . . . .”).

[39] Summers and some of his aligned amici advance a safety-related argument, predicting the 
“complete destruction of the incentive to make the workplaces safe” if Summers loses. But whether one scheme promotes workplace 
safety over the other is a legislative call, not ours. In any case, the record 
shows that Entergy employees work alongside IMC employees, and the Act gives 
those protected by the exclusive-remedy defense concrete incentives to minimize 
job-related risks. See Tex. Ins. Code. 
§§ 2053.001-.054; Lee Lewis Constr., Inc. v. 
Harrison, 70 S.W.3d 778, 795 (Tex. 2001) (Hecht, J., concurring) (a 
contractor’s employer “has the same economic incentive the contractor has to 
minimize job-related risks to workers”). Premiums are tied to accident records, 
and rates are higher for unsafe employers. Also, regulations from the 
Occupational Safety and Health Administration cover Entergy’s direct workers 
just as fully as they cover Entergy’s contract workers. See 29 U.S.C. § 
654. Finally, nothing in the record suggests the exclusive-remedy defense has 
spurred employers to care less about preventing jobsite accidents than those who 
face common-law liability.

[40] Written Testimony of the Texas Association 
of Defense Counsel: Hearing on Interim Charge Number Eight Before the Senate 
State Affairs Comm., 80th Leg., Interim (April 28, 2008).

[41] See Jill Williford, Comment, Reformers’ Regress: 
The 1991 Texas Workers’ Compensation Act, 22 St. Mary’s L.J. 1111, 1124–25 
(1991).

[42] See John T. Montford et al., A Guide to Texas 
Workers’ Comp Reform 3 (1991) (reporting that conferees agreed on 
fourteen of sixteen chapters in the bill, “but there were colossal differences 
in the dispute resolution and benefits proposals”).

[43] District of Columbia v. Heller, 
128 S.Ct. 2783, 2796 (2008).

[44] Nothing in the amendment itself defined “owner,” and despite what one amicus describes 
as “hundreds of hours of hearings that led to the 1989 overhaul,” not a single 
word was devoted to this single word. The legislative record lacks any signal as 
to what even one lawmaker thought about expressly including owners, whether it 
was thought ill-advised or redundant or even thought about at all.

[45] See __ S.W.3d __.

[46] Tex. Employment Comm’n v. Holberg, 440 S.W.2d 
38, 42 (Tex. 1969) (“we attach no controlling significance to the Legislature’s 
failure to enact the proposed amendment”); see also El Chico Corp. v. 
Poole, 732 S.W.2d 306, 314 (Tex. 1987); Dutcher v. Owens, 647 S.W.2d 948, 950 (Tex. 
1983) (warning against gleaning legislative intent from failed bills: “Any such 
inference would involve little more than conjecture.”).
                
    Nor, as the Court stresses, __ S.W.3d __, can post-hoc 
statements by legislators shed light on what a statute means. See Consumer 
Prod. Safety Comm’n v. GTE Sylvania, Inc., 447 
U.S. 102, 117-18 (1980) (disregarding 
such statements about an earlier-passed statute: “the views of a subsequent 
Congress form a hazardous basis for inferring the intent of an earlier one”). 
The Legislature is composed of 181 diverse members representing diverse areas 
with diverse priorities; one lawmaker’s perspective may be radically different 
than that of his or her 180 colleagues. See AIC Mgmt. v. Crews, 246 
S.W.3d 640, 650 (Tex. 2007) (Willett, J., concurring) (“The statute itself is 
what constitutes the law; it alone represents the Legislature’s singular will, 
and it is perilous to equate an isolated remark or opinion with an 
authoritative, watertight index of the collective wishes of 181 individual 
legislators, who may have 181 different motives and reasons for voting the way 
they do.”); Gen. Chem. Corp. v. De la Lastra, 
852 S.W.2d 916, 923 (Tex. 1993) (“[T]he intent of an individual legislator, even 
a statute’s principal author, is not legislative history controlling the 
construction to be given a statute.”). This explains our consistent view — 
reinforced by the U.S. Supreme Court, see, e.g., Heller, 128 S.Ct. at 2805 — that post-passage actions and comments are 
immaterial:
 
[C]ourts construing statutory 
language should give little weight to post-enactment statements by legislators. 
Explanations produced, after the fact, by individual legislators are not 
statutory history, and can provide little guidance as to what the legislature 
collectively intended.
 
In re Doe, 19 
S.W.3d 346, 352 (Tex. 2000) (quoting C & 
H Nationwide, Inc. v. Thompson, 903 S.W.2d 315, 328-29 (Tex. 1994) (Hecht, J., 
concurring and dissenting) (citations omitted)). The very notion of “subsequent 
legislative history” is oxymoronic. After-the-fact comments may constitute 
history, and they may concern legislation, but they are not part of the 
legislative history of the original enactment. See Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 
1082 (5th Cir. 1980). Judge Posner offers a grave caution: 
Judges who credit “subsequent expressions of intent not embodied in any statute 
may break rather than enforce the legislative contract.” Richard A. Posner, The Federal Courts 
270 (1985). Judges also risk getting snookered. See, e.g., 
Am. Hosp. Ass’n v. NLRB, 899 F.2d 651, 657 (7th 
Cir. 1990) (“Post-enactment legislative history . . . is sometimes a sneaky 
device for trying to influence the interpretation of a statute, in derogation of 
the deal struck in the statute itself among the various interests represented in 
the legislature. Courts must be careful not to fall for such tricks and thereby 
upset a legislative compromise.”) (citations omitted). 
Finally, even proponents of legislative history, even those proponents willing 
to consider legislators’ post-enactment comments, disregard statements from 
legislators who did not hold office when the disputed statute was 
enacted.

[47] United 
States v. Price, 361 U.S. 304, 310-11 
(1960). See also Perez v. United States, 167 F.3d 913, 917 (5th Cir. 
1999 ) (“deductions from congressional inaction are 
notoriously unreliable”).

[48] Nat’l Liab. 
& Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000) (“If possible, 
we must ascertain the Legislature’s intent from the language it used in the 
statute and not look to extraneous matters for an intent the statute does not 
state.”).

[49] See Tex. S.B. 1404, 76th Leg., R.S. 
(1999).

[50] Id.

[51] Id.

[52] See Tex. H.B. 2279, 74th Leg., R.S. (1995); Tex. H.B. 3024, 75th 
Leg., R.S. (1997).

[53] See Tex. H.B. 3120, 77th Leg., R.S. (2001); Tex. H.B. 3459, 77th Leg., R.S. (2001); Tex. S.B. 675, 78th Leg., 
R.S. (2003).

[54] See Tex. H.B. 2982, 78th Leg., R.S. (2003); Tex. H.B. 1626, 79th 
Leg., R.S. (2005).

[55] See Tex. S. Rule 7.07(b), Tex. S. 
Res. 14, 81st Leg., R.S., 2009 S.J. of Tex. 21, 23.

[56] Frank H. Easterbrook, Text, History, and 
Structure in Statutory Interpretation, 17 Harv. J.L. & Pub. 
Pol’y 61, 68 
(1994).

[57] As the Court reaffirms today, if the 
Legislature’s words are not ambiguous, they are not only the best evidence of 
legislative intent but the exclusive evidence. __ S.W.3d 
__. Even if we accepted the invitation to utilize extratextual aids to divine a more embellished meaning, it 
would make little difference here. The record surrounding the Act’s adoption and 
the nine failed post-1989 bills lacks any indication that lawmakers meant to 
disqualify owners from acting as their own general contractors under the 
Act.

[58] Alex Sheshunoff Mgmt. Servs. v. 
Johnson, 209 S.W.3d 644, 652 n.4 (Tex. 
2006).

[59] United 
States v. Shreveport 
Grain & Elevator Co., 287 U.S. 77, 83 (1932) (quoting Hamilton v. Rathbone, 175 U.S. 414, 421 (1899)).

[60] Justice Frankfurter cautioned against what 
he called “loose judicial reading”: “Loose judicial reading makes for loose 
legislative writing. It encourages the practice illustrated in a recent cartoon 
in which a senator tells his colleagues ‘I admit this new bill is too 
complicated to understand. We’ll just have to pass it to find out what it 
means.’” Felix Frankfurter, Some Reflections on the Reading of Statutes, 
47 Colum. L. Rev. 527, 545 
(1947).

[61] For example, one amicus 
curiae mistakenly asserts the Legislature deleted the upstream-contract 
language during the 1993 nonsubstantive codification. 
This misstep matters, as the amicus argues from this 
false premise that since “contracted with another party” — a phrase the amicus 
bolds and labels “enlightening” — was omitted in 1993, its absence cannot aid 
Entergy since “the Legislature intended no substantive change to the law 
by its 1993 codification.” Thus, since lawmakers wanted to maintain the status 
quo, we must read back into the Act a critical phrase the Legislature deleted. 
One problem: the upstream-contract provision, which is indeed “enlightening,” 
was deleted not during the 1993 nonsubstantive 
codification but during the 1989 substantive overhaul, when lawmakers enacted a 
raft of major changes. See Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 
(amended 1989). Interestingly, this amicus apparently realized its error because 
its supplemental brief acknowledges that “contracted with another party” was 
deleted during the 1989 reform when “subcontractor” was rewritten, “though not 
extensively,” the amicus now insists.
                
    Another amicus brief contains at least two factual 
missteps in recounting the Legislature’s 1989 deliberations. First, the brief 
inaccurately states, “In the draft bill considered during the regular session, 
immunity was extended to owners, as well as general contractors.” The word 
“owner” never appeared during the regular session; it appeared in a House 
revision during the first-called special session. Tex. S.B. 1, 71st Leg., 1st 
C.S. (1989); see also H.J. of Tex., 71st Leg., 1st C.S. 76 (1989). The brief 
then errs again, stating “in the subsequent special session [the Legislature] 
removed premises owners from the list of actors granted immunity.” Nobody in 
either chamber removed “owner” in the first-called special session; just the 
opposite, “owner” was momentarily added during this special session (and 
was absent from the bill adopted during the next session several months later). 
Id. 
Unless challenged by opposing counsel, such inaccuracies, however inadvertent, 
carry real potential to mislead judges and skew judicial decisionmaking.

[62] See infra note 64. It is 
unsurprising that advocates accentuate the positive and eliminate the negative. 
Such cherry-picking, as Judge Harold Leventhal 
famously observed, is “the equivalent of entering a crowded cocktail party and 
looking over the heads of the guests for one’s friends.” Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., concurring).

[63] As noted above, supra note 61, one 
brief states the Legislature “removed premises owners 
from the list of actors granted immunity.” This suggests the Legislature took 
targeted action to eliminate “owner” from a pending draft. The legislative 
record belies this suggestion. Nobody “removed” the word “owner” during the 
second special session, because no bill that session ever included the 
word “owner.” You cannot remove what does not exist, subtracting what is not 
there. The locution implies that lawmakers in 1989 took proactive steps to strip 
“owner” from a pending bill, but “removed” is not the same as “not included.” 
Nothing in the record shows specific action to remove “owner” from any bill 
during that final special session. The word was absent altogether, though the 
record contains nothing to suggest why.
                
    Another brief follows suit, stating that during the 
first special session, after the House passed a bill that contained “owner,” the 
Senate “refused to concur in the House amendments.” While literally true — the 
Senate did in fact reject House changes — it suggests senators balked 
specifically at “owner.” Not exactly. After the Senate 
passed Senate Bill 1, the House struck everything below the enacting clause, 
substituted an earlier House-passed version (which differed markedly from the 
Senate version) and sent it back across the rotunda. See H.J. of 
Tex., 71st 
Leg., 1st C.S. 76 (1989). Nothing suggests the Senate 
refused to concur because of “owner.” In fact, a treatise (co-authored by the 
lead Senate sponsor) states the Senate’s refusal rested on entirely separate 
issues. See Montford, supra note 42, 
at 3 (noting consensus stalled due to “colossal differences in the dispute 
resolution and benefits proposals”). Still another brief asserts that “efforts 
in prior drafts to include the term ‘owner’ were rejected.” This wording 
suggests multiple targeted efforts to erase “owner” from pending drafts, but the 
lone mention of “owner” came in the first special session, in a bill that died 
over unrelated issues. The brief states a House amendment “specifically included 
the word ‘owner’” and the Senate “refused to concur in the House amendment, and the bill failed.” The inference is misleading: 
the House amendment was not a rifle-shot inclusion of “owner” but a wholesale 
substitution of its earlier bill, with all the “colossal differences” noted by 
Senator Montford.

[64] Just before final passage, Senator Dickson, 
who opposed tort immunity for general contractors, attached a floor amendment 
stating that a subcontractor’s workers could bring a “third party action . . . 
against said general contractor.” Senator Dickson contended that, absent his 
amendment, a refinery owner would be immune if an accident killed a 
subcontractor’s employees: “Yes sir it seems to me . . . [that] no matter how 
negligent, no matter how much at fault that operator was, and no matter how many 
people he killed, he wouldn’t be liable.” Debate on Tex. S.B. 
1 on the Floor of the Senate, 71st Leg., 2d C.S. 17 (Nov. 20, 1989) (transcript 
available from Senate Staff Services Office).
 
                                                                
    Senator Edwards: So in a case like the Phillips 
refinery explosion, if Phillips had been negligent and your amendment wasn’t 
law, even though dozens of people were killed, Phillips wouldn’t be liable in 
any way for their negligence?”
 
                                                                
    Senator Dickson:              
      He would be immune. Would not be liable according to Senator Glasgow’s construction and 
my reading of this new statute.
 
Id. Senator 
Dickson’s pro-plaintiff amendment was later removed. This colloquy did not 
address whether “general contractor” included owners, but it is notable that 
Senator Edwards’s hypothetical presumed the owner and the general contractor 
were one and the same. If that contradicted the Senate’s collective intent, no 
senator rose to correct it. As Senator Dickson described his own amendment, it 
was to ensure that an owner’s injured contract worker would not be limited to 
comp benefits. Summers says Senator Dickson was “simply confused” and later “got 
sort of educated” that the bill did not contemplate owners doubling as general 
contractors. The floor transcript reveals no such 
enlightenment.
                
    While this discussion is not dispositive (or even relevant) — Senator Dickson’s view is 
merely his alone, not fairly attributable to his 180 colleagues — it posed the 
issue presented here: a premises owner acting as a general contractor. If Senator Dickson was off-target because the Legislature never 
intended to let owners claim general-contractor status, no senator called it to 
the Senate’s attention. The only reason I mention it is to stress how 
manipulable legislative history can be (by lawyers and 
judges alike), and that its indeterminacy is only made worse by the selectivity 
with which it is utilized.

[65] It is not hard to imagine a legislator 
voting for a bill she actually opposes and then reading into the record a 
restrictive interpretation that aims to blunt the bill’s real-world impact. 
Looking at today’s case specifically, a crafty lawmaker who wanted “general 
contractor” construed narrowly could file a bill that explicitly added 
the word “owner” to the definition, then quietly urge that the bill stay 
buried in committee so a future litigant can cajole a judge into believing that 
the Legislature’s failure to pass the bill evinces legislative rejection of an 
owner-included definition.

[66] Fitzgerald v. Advanced Spine Fixation 
Sys., 996 
S.W.2d 864, 866 (Tex. 1999).

[67] Alex Sheshunoff Mgmt. Servs. v. 
Johnson, 209 S.W.3d 644, 652 n.4 (Tex. 
2006).

[68] We enforce the Legislature’s words as 
written unless such a reading would produce absurd results. Fleming Foods of Tex., Inc. v. 
Rylander, 6 S.W.3d 278, 284 (Tex. 
1999).

[69] Summers argues the Court’s ruling would 
work an absurdity by opening up workers’ compensation benefits to a neighborhood 
child who rakes your leaves. The Act expressly contradicts that argument, 
speaking directly to “a person employed as a domestic worker or a casual worker 
engaged in employment incidental to a personal residence.” Tex. Lab. Code 
§ 406.091(a)(1). The Act exempts such employees from 
coverage, though it allows employer-homeowners to voluntarily accept the rights 
and responsibilities of providing such coverage. Id. § 406.091(b). It would be curious to brand legally “absurd” 
something the statute itself permits. Comp-covered lawnboys are possible under the Act because the Legislature, 
not this Court, explicitly says so.

[70] __ S.W.3d __.

[71] One side point: While recovery of workers’ 
compensation benefits is a covered worker’s (or his legal beneficiary’s) 
exclusive remedy in the event of a work-related injury or death, Tex. Lab. Code 
§ 408.001(a), the very next subsection makes clear that a worker’s 
surviving spouse or heirs may sue for exemplary damages if the death “was caused 
by an intentional act or omission of the employer or by the employer’s gross 
negligence,” id. § 408.001(b).

[72] Montford, supra note 42, at 
1.

[73] Williford, 
supra note 41, at 11-12.

[74] Our precedent reaching back a century 
demands judicial modesty, and for such modesty to take root, “[c]ourts must take statutes as they find them. More than that, 
they should be willing to take them as they find them.” Simmons v. Arnim, 220 S.W. 66, 70 
(Tex. 
1920).

[75] Tex. Workers’ Comp. Comm’n v. Garcia, 893 S.W.2d 504, 520 (Tex. 1995) (quoting Smith v. Davis, 426 S.W.2d 827, 
831 (Tex. 
1968)).

[76] In re Jorden, 249 S.W.3d 416, 424 (Tex. 2008). We sometimes 
weigh the Legislature’s power to enact a statute, but, heeding Justice 
Holmes’s admonition, we never weigh its prudence: “We fully understand . 
. . the very powerful argument that can be made against the wisdom of the 
legislation, but on that point we have nothing to say, as it is not our 
concern.” Noble State Bank v. Haskell, 219 
U.S. 575, 580 
(1911).

[77] Posting of David M. Herszenhorn to the Caucus: The Politics and Government Blog of the Times, 
http://thecaucus.blogs.nytimes.com/2009/02/13/ 
final-draft-on-stimulus-bill-complete-with-last-minute-edits/ (Feb. 13, 2009, 
9:52 EST). See also Mark Lander, New Terrain For Arbiters Of a 
Bailout, N.Y. Times, Nov. 4, 
2008, at B1 (describing the no-time-for-reading dynamic surrounding passage of 
the October 2008 federal financial rescue package). Another classic federal 
example is the 1989 Budget Reconciliation Act, which consisted of a 
thousand-plus, unnumbered, and unindexed pages bound 
together with rope. See Rep. Christopher Cox, Why Congress Doesn’t 
Work, Part I, Lecture #406 (Sept. 11, 1992) (reprinted at 
http://www.heritage.org/research/governmentreform/ HL406.cfm):
 
There was no other copy for any member to look at or 
read, other than what was in this box. Now I will allow, while I was not able to 
read it, I was permitted to walk down into the well and gaze upon it from 
several angles, and even to touch it. When we voted on that bill, at about four 
o'clock in the morning, not a single member of the House had read it; not a 
single member of the Senate had read it.

[78] One example is the federal luxury tax, 
imposed in 1990 on everything from furs to yachts. Proponents saw it as a 
pain-free, palatable and progressive way to raise tax revenue, but the impact 
was staggering. The boat-building industry was capsized, throwing thousands of 
blue-collar workers out of work, in turn straining public welfare and 
unemployment budgets as dislocated workers sought relief. Congress swiftly 
repealed the tax. Phil Hampton, Boating Casts Off Bad Times, Sales Swell 
After Luxury Tax Drowns, USA Today, Aug. 19, 1994, at 
01B.

[79] __ S.W.3d __ (O’Neill, J., 
dissenting).

[80] Id. at __.

[81] Id. at __.

[82] Id. at __ (citing Tex. Gov’t Code § 311.011(a)).

[83] Tex. Gov’t Code § 311.011(b) (“Words and phrases that have 
acquired a technical or particular meaning, whether by legislative definition or 
otherwise, shall be construed accordingly.”).

[84] Tijerina v. City of Tyler, 846 S.W.2d 825, 827 (Tex. 1992).

[85] See supra note 20.

[86] Tex. Dep’t of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002); see also Transp. 
Ins. Co. v. Faircloth, 898 S.W.2d 269, 274 (Tex. 1995) (“[w]e are bound to construe these 
terms in accordance with their statutory definitions”).

[87] See __ S.W.3d __.

[88] __ S.W.3d __ (O’Neill, J., 
dissenting).

[89] Tex. Lab. Code 
§ 406.121(2) (emphasis added).

[90] __ S.W.3d __ (O’Neill, J., dissenting) 
(citing Indus. Indem. Exch. v. 
Southard, 160 S.W.2d 905, 907 (Tex. 1942); Shannon v. W. Indem. 
Co., 257 S.W. 522, 524 (Tex. Comm’n App. 
1924, judgm’t adopted)).

[91] Southard, 160 
S.W.2d at 906; Shannon, 257 S.W. at 522-23.

[92] Tex. Gov’t Code § 311.005(13) 
(“‘Includes’ and ‘including’ are terms of enlargement and not of limitation or 
exclusive enumeration, and use of the terms does not create a presumption that 
components not expressed are excluded.”).

[93] __ S.W.3d __ (Hecht, J., 
concurring).

[94] City of Rockwall v. Hughes, 246 
S.W.3d 621, 632 (Tex. 2008) (Willett, J., dissenting) (“The import of language, 
plain or not, must be drawn from the surrounding context, particularly when 
construing everyday words and phrases that are inordinately 
context-sensitive.”).

[95] Besides finding little useful in the 
history of section 406.124, I also disagree with the notion that our decision 
should turn on a rule that construes statutory ambiguities in favor of workers’ 
comp coverage and against common-law tort liability. I do not believe we can say 
the Legislature, actually many different Legislatures, urges a comp-over-tort 
rule whenever uncertainly arises. The Legislature of course could expressly 
incorporate such a preference into the Act, but it has not done so. The Workers’ 
Compensation Act and the common law of negligence are both comprehensive, 
time-honored systems of compensating injured individuals. While I would reject 
any suggestion from Summers and his aligned amici that workers’ compensation is a disfavored remedy, 
likewise I cannot agree that in all cases of doubt the Legislature would have us 
elevate the statutory system over the common-law system and apply the statutory 
remedy whenever statutory coverage is unclear.

[96] See The Federalist No. 78 (Alexander 
Hamilton).